**Bill GLASER, a minor, by his mother and natural guardian, Ruth Glaser, and Ruth Glaser, in her own right, on his behalf, Plaintiffs,**

v.

**Leslie H. MARIETTA, Superintendent of the School District of Northgate, et al., Defendants.**

Civ. A. No. 71–1209.

United States District Court,
W. D. Pennsylvania.

Nov. 1, 1972.

Michael P. Malakoff, Berger & Kapetan, Pittsburgh, Pa., for plaintiffs.

William W. Milnes, Brandt, McManus, Brandt & Malone, Pittsburgh, Pa., for defendants.

## OPINION

WEIS, District Judge.

The Northgate School District permits corporal punishment of students under carefully controlled situations. This suit challenges the right of the school to utilize such a disciplinary method on the grounds that it constitutes cruel and unusual punishment and, secondly, it usurps parental rights.

The underlying Pennsylvania legislation is found in Purdon's Statutes, Title 24 § 13–1317, which reads as follows:

"Every teacher, vice principal and principal in the public schools shall have the right to exercise the same authority as to conduct and behavior over the pupils attending his school, during the time they are in attendance, including the time required in going to and from their homes, as the parents, guardians or persons in parental relation to such pupils may exercise over them."

In accordance with the authority granted by this statute, the School District promulgated certain administrative regulations with respect to punishment. They are as follows:

"Corporal punishment must be regarded as a last resort and may be employed only in cases where other means of seeking cooperation from a student have failed. The Bellevue Borough School Board requires that, if it appears that corporal punishment is likely to become necessary, the teacher must confer with the principal or assistant principal. The principal and the teacher must be in agreement on the necessity of corporal punishment, and it is the principal's responsibility to designate time, place, and the person to administer said punishment. In any case, the pupil should understand clearly the seriousness of the offense and the reasons for his punishment; however, care should be taken that the period of time between the offense and punishment is not so long as to cause undue anxiety in the pupil. The punishment must be administered in kindness in the presence of another adult and at a time and under conditions not calculated to hold the child up to ridicule or shame.

"In administering corporal punishment, the teacher and principal must

not use any instrument which will produce physical injury to the child and no part of the body above the waist nor below the knees may be struck.

"Corporal punishment should never be administered to a child whom school personnel note to be under psychological or physical treatment, without a conference with the psychologist or physician.

"Repetition of this problem should be referred to the Guidance Services Department."

William Glaser, a seventh grade student in the Bellevue Junior High School, became involved in an altercation in the classroom with one George Espinosa on December 3, 1971. After quelling the disturbance, the teacher in charge took both 12 year old boys to the school office where they were interrogated both together and separately by Robert Perry, the assistant principal. After his discussion with the combatants, Mr. Perry concluded that William was at fault and since the boy had been admonished by several of his teachers on prior occasions about his hostility toward Espinosa, corporal punishment should be administered.

William said that his mother did not wish him to be paddled by school officials but when told that suspension was an alternative form of punishment, he chose paddling. In the presence of another adult member of the school staff, the vice principal then administered three "medium" paddle strokes on William's buttocks.

Testimony developed that paddling is used infrequently in the school system, and is invoked mainly in serious cases such as those involving fighting and snowballing. As a matter of personal discretion, Mr. Perry testified that he did not spank girls, feeling that other forms of punishment were more effective, and that he did not use corporal punishment on a student when parents requested otherwise.[1] He stated that he had not received any such prohibition respecting William from Mrs. Ruth Glaser, William's mother and the adult plaintiff. The disciplinary problems in this school, according to the record, are no different from those of a private academy and parochial schools located in the same area.

The first contention advanced by the plaintiffs is that corporal punishment in and of itself is violative of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and, hence, the rights of the minor plaintiff were violated by spanking.

After careful consideration, we hold to our view that corporal punishment in the manner in which it is practiced in the Northgate School District is not violative of the Constitution insofar as the minor plaintiff is concerned. There was no excessive amount of force involved, the sanction is not used indiscriminately, and we do not find that use of corporal punishment *per se* is unreasonable under the circumstances.

The plaintiff produced child psychologists who testified that in their opinion corporal punishment was not warranted in an educational setting and, in opposition, the defense produced a highly qualified expert in the field who concluded that this form of discipline should indeed be used in the schools. The expert testimony was evenly balanced, indicating that there is indeed a sharp difference of opinion among those who have done extensive work and study on the problem. However, it is not for us to choose sides in this battle of the experts because the wisdom or desirability of utilizing corporal punishment as a means of discipline in the schools is not for this court to decide. The question is whether this method of disciplining children is per se unconstitutional and, hence, subject to attack by the person

---

1. This evidence was not offered during the hearing for a preliminary injunction and not until the final hearing was the court made aware of this policy. Apparently Mrs. Glaser did not know either.

most directly effected, the child on the receiving end of the paddle.

We start with the obvious propositions that there is a difference between a child and an adult and that it is conceded that parents have the right to inflict corporal punishment upon their young children. The law recognizes that the immaturity of children in their earlier years and the consequent inability to recognize the necessity for regulation has traditionally been held to justify the moderate use of parental force as an effective alternative to reasoned exhortation. A method of parental control originating in the mists of prehistoric times, commended in Biblical references, sanctioned by Blackstone's Commentaries and defended by many of today's child psychologists, is not lightly to be declared unconstitutional. Nor indeed has any court done so.

The school system claims its right to administer the punishment by virtue of legislation granting to it a measure of parental rights. If corporal punishment administered by a parent is not unconstitutional, then a reasonable utilization of that same form of chastisement by a properly delegated person is not prohibited. The child has no constitutional grounds to object to such disciplinary methods so long as they are reasonable, properly administered so as not to cause harm, and are legally authorized.

The paddling as prescribed and practiced by the defendant School District does not cause physical or psychological damage to the students, nor are there grounds for inferring that such untoward events might occur in the future.

The School District has the power to enact necessary regulations for the conduct of its students and the orderly control of activities in the classroom, including methods of enforcement. Tinker v. Des Moines Independent School District, 393 U.S. 503, 89 S.Ct. 733, 21 L. Ed.2d 731 (1969). It is the student's obligation to submit to the regulations or suffer the prescribed lawful consequences. We agree with the two district court cases cited to us as to the holding that corporal punishment of school children is not a *per se* cruel and unusual punishment in the constitutional sense. *See* Sims v. Board of Education, 329 F. Supp. 678 (D.C.N.Mexico 1971) and Ware v. Estes, 328 F.Supp. 657 (N.D. Tex.1971), aff'd. per curiam 458 F.2d 1360 (5th Cir. 1972).

Young Glaser also claims that the procedures to be followed before infliction of a paddling are deficient and do not comport with constitutional notions of fair hearing and guilt determination. While there are a number of cases dealing with such procedural problems in the context of suspension and expulsion on the high school and university level, we find that those precedents are of little assistance here.[2] It is obvious that the means utilized to determine the necessity for suspension from a campus of a college student may and should be quite different from those used by a principal in deciding whether to spank a grade school youngster.

In any event, we have reviewed the procedure as utilized by the Northgate School District and find that it is reasonably suited for the purpose. The interview with the student when he is informed by the principal of the nature of the infraction, the discussion leading to a determination of guilt or innocence, and the speedy administration of punishment, if necessary, are reasonable examples of due process procedures in a grade school setting.

To suggest that it is necessary to have representation by counsel,[3] a written statement of charges, a fixed date for a

---

2. *See, e. g.,* Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961) ; Woods v. Wright, 334 F.2d 369 (5th Cir. 1964) ; Wasson v. Trowbridge, 382 F.2d 807 (2nd Cir. 1967) ; Due Process and School Discipline, 119 U. of Pa.L.Rev. 545 (1971).

3. Quaere—whether this is required even in a university, *see* Wasson v. Trowbridge, *supra.*

hearing, and all the other panoply of an adversary hearing, means to carry to an extreme a concept which fundamentally requires fair play under appropriate circumstances. To unduly complicate the pre-punishment proceeding would smother the educational process in legalisms and do much to frustrate the beneficial results of speedy chastisement.

What has been said to this point, however, does not decide the issue raised by Mrs. Glaser, that of her parental right to raise her son as she thinks proper.

We begin with differing general principles than those applicable to the first phase of the case and consider the claims of the parent, rather than those of the child.

In discussing a conflict between the parents' desire to direct the religious training of their children and the state's interest in compulsory education, The Supreme Court said:

"The history and culture of western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition * * *. To be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitation under *Prince* if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.

\* \* \* \* \* \*

"Thus, a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on other fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce* [v. Society of Sisters, 268 U.S. 510, 45

S.Ct. 571, 69 L.Ed. 1070], 'prepare [them] for additional obligations.'"
(Wisconsin v. Yoder, 406 U.S. 205, 232, 233, 234, 92 S.Ct. 1526, 1541, 1542, 32 L.Ed.2d 15 (1972)).

In an earlier case, Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), Mr. Justice Rutledge wrote:

"It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder . . .. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter.

"But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. [Citations] And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well-being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience."

In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court was concerned with rights of custody and in the course of its opinion said:

"The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection.

\* \* \* \* \* \*

"The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential', [citations], 'basic civil rights of man,'

[citation] and '[r]ights far more precious . . . than property rights,' . . . ."

The position of the School District is probably most clearly expressed by the American Law Institute in the Restatement of Torts 2d § 153:

"(1) One who is in charge of the control, training, or education of a child solely as the delegate of its parent is not privileged to inflict a punishment which the parent has forbidden or to punish the child for doing or refusing to do that which the parent has directed the child to do or not to do.

[This provision applies to private schools only]

"(2) One who is in charge of the education or training of a child as a public officer * is privileged to inflict such reasonable punishments as are necessary for the child's proper education or training, notwithstanding the parent's prohibitions or wishes."

In explanation, Comment (d) says: "In such cases, the fact that the parent expresses a desire that the child should not be punished in a particular way or for a particular offense does not restrict the privilege of the school authorities. The will of the parent cannot defeat the policy of the State. The school authorities, therefore, have such disciplinary privilege as is reasonably necessary to secure the education of the child irrespective of the wishes of its parent. The same is true where the parent sends the child to a public school in preference to a private school as a matter of economy or choice."

Does this philosophy comport with the spirit of The Supreme Court decisions. We think not.

▮ The regulations enacted by the School District on their face appear to be reasonable, within the scope of authority which the state is authorized to grant to it, and in agreement with the preference of many parents. But when the regulations are confronted with the flat prohibition of a particular parent and an assertion of her fundamental rights to raise her child in the manner in which she chooses, then obviously the balancing process inherent in the Yoder and Prince cases becomes necessary.

As The Supreme Court said in the Yoder case:

". . . we must searchingly examine the interests that the State seeks to promote . . . ."

and in Stanley it was held that the state must present a powerful countervailing interest to overrule the private rights of the parent.

There may be vigorous philosophical argument that the court should not hinder the school in its operations and the fact that perhaps only one out of hundreds of parents of the pupils in the school objects to corporal punishment is no reason to strike down the uniform application of the regulations.[4] Whatever force these general propositions may have in the abstract, however, is dissipated by the evidence in this case.

Vice Principal Perry testified that, in fact, he has deferred to the parents' wishes and has not used paddling where he was informed by them that they did not desire it be inflicted upon their child. Mr. Perry admitted that this practice has had no significant effect upon discipline at the school and he was corroborated by the School Superintendent, Mr. Marietta, who said that the Bellevue Junior High School is a well-run, disciplined organization.

The essence of the plaintiff parent's request for an injunction in this case therefore is to require the substance of regulations to conform with actual prac-

---

* A teacher in a public school is considered to be a public officer.

4. According to Time Magazine, a 1970 Gallup poll reported that 62% of parents queried were in favor of modest use of corporal punishment and a 1969 National Education Association poll found that 65% of elementary school teachers agreed with judicious use of physical punishment. *Time*, June 12, 1972.

tice. Thus when the "balancing" of the respective rights occurs, whether the test is if the regulation is "reasonably necessary"[5] or that the school must show a "powerful countervailing interest",[6] the result is the same. The facts in this case demonstrate that the regulation satisfies neither test and that the School District has established no reason why it should prevail over the asserted claim of basic parental right.

One of the witnesses for the defense remarked during her testimony that the form of punishment to be administered to a wayward student requires the exercise of a judgment and that this judgment should be made by the professionals or the school administration. We differ in the designation of the governing tribunal. The obligation is that of the parent primarily, not the state, not the school, and may be made by the parent absent weighty factors which we do not find to exist in this case. Where justification for the deprivation of a personal liberty cannot be shown, it may not be taken away by the state or its agency.

Perhaps it need be said, however, that deference by principals and teachers to the right of a parent does not in any way relieve him of responsibility for the elimination of disruptive conduct during school attendance by his child. If a parent is unwilling to grant discretion to the school officials, if he is unwilling to delegate authority to paddle or spank whenever that is indicated, then he must be prepared to take the steps needed to effectively discipline his errant child. The parent must actively, promptly, and effectively assert his authority so that the other children will not be hampered in their educational pursuits and school activities will not be disorganized. As always, with right goes responsibility.

Clearly, in granting the relief requested, if we need not invalidate the regula-

tions in their entirety, we should not, because in general the rules of the school board are a valid exercise of its regulatory power.

The evidence does not show a necessity for a uniform application of the regulations but, to the contrary, demonstrates the feasibility of selective administration. Thus it is possible to harmonize the desires of those parents who approve of corporal punishment for their children in the school with those who take a different stand with respect to their offspring.

Our ruling is that the School District may enforce its rules on corporal punishment except as to a child whose parents have notified the appropriate authorities that such disciplinary method is prohibited.

An appropriate order will be entered.

---

5. Stull v. School Board, 459 F.2d 339 (3rd Cir. 1972); Axtell v. LaPenna, 323 F.Supp. 1077 (W.D.Pa.1971).

6. Stanley v. Illinois, *supra.*