**Virginia BAKER and Russell Carl Baker, Plaintiffs,**

**v.**

**W. C. OWEN, Principal of Gibsonville School, et al., Defendants.**

**No. C-74-46-G.**

United States District Court,
M. D. North Carolina,
Greensboro Division.

Heard Jan. 13, 1975.

Decided April 23, 1975.

Norman B. Smith, Smith, Carrington, Patterson, Follin & Curtis, Greensboro, N. C., for plaintiffs.

Welch Jordan and William D. Caffrey, Jordan, Wright, Nichols, Caffrey & Hill, Greensboro, N. C., for defendants Owen and Langston.

John W. Hardy and Frank W. Bullock, Jr., Douglas, Ravenel, Hardy & Crihfield, Greensboro, N. C., for defendant Pearce.

Rufus L. Edmisten, Atty. Gen., of North Carolina, Andrew A. Vanore, Jr., Deputy Atty. Gen., and Raymond L. Yasser, Associate Atty. Gen., Raleigh, N. C., for defendant Edmisten.

Before CRAVEN, Circuit Judge, GORDON, Chief District Judge, and WARD, District Judge.

CRAVEN, Circuit Judge:

This three-judge court was convened to consider the claims of Russell Carl Baker and his mother that their constitutional rights were violated when Russell Carl was corporally punished by his teacher over his mother's objections and without procedural due process. Russell Carl, a sixth-grader, was paddled on December

6, 1973, for allegedly violating his teacher's announced rule against throwing kickballs except during designated play periods. Mrs. Baker had previously requested of Russell Carl's principal and certain teachers that Russell Carl not be corporally punished, because she opposed it on principle. Nevertheless, shortly after his alleged misconduct her son received two licks in the presence of a second teacher and in view of other students.

Mrs. Baker alleges that the administration of corporal punishment after her objections violated her parental right to determine disciplinary methods for her child. Russell Carl charges that the circumstances in which the punishment was administered violated his right to procedural due process, and that the punishment itself in this instance amounted to cruel and unusual punishment. This special court was convened because both Mrs. Baker in her claim and Russell Carl in his procedural due process claim have challenged the constitutionality of North Carolina General Statutes § 115–146. They claim that this statute, which empowers school officials to "use reasonable force in the exercise of lawful authority to restrain or correct pupils and to maintain order," [1] is unconstitutional insofar as it allows corporal punishment over parental objection and absent adequate procedural safeguards.

We hold that fourteenth amendment liberty embraces the right of parents generally to control means of discipline of their children, but that the state has a countervailing interest in the maintenance of order in the schools, in this case sufficient to sustain the right of teachers and school officials to administer reasonable corporal punishment for disciplinary purposes. We also hold that teachers and school officials must accord to students minimal procedural due process in the course of inflicting such punishment. We further hold that the spanking of Russell Carl in this case did not amount to cruel and unusual punishment.

## I.

Defendants contend that this court was improperly convened because plaintiffs do not mount a substantial attack on the constitutionality of the statute. Defendants argue, first, that plaintiffs' claims present no substantial constitutional question; and second, that even if authorities need parental consent and certain procedures before punishing students corporally, section 115–146 would stand unscathed because it could be reinterpreted as requiring parental consent and procedural safeguards for force to be "reasonable" and authority to be "lawful."

1. N.C.Gen.Stat. § 115–146 reads as follows:

*Duties of teachers generally; principals and teachers may use reasonable force in exercising lawful authority.*—It shall be the duty of all teachers, including student teachers, substitute teachers, voluntary teachers, teachers' aides and assistants when given authority over some part of the school program by the principal or supervising teacher, to maintain good order and discipline in their respective schools; to encourage temperance, morality, industry, and neatness; to promote the health of all pupils, especially of children in the first three grades, by providing frequent periods of recreation, to supervise the play activities during recess, and to encourage wholesome exercises for all children; to teach as thoroughly as they are able all branches which they are required to teach; to provide for singing in the school, and so far as possible to give instruction in the public

school music; and to enter actively into the plans of the superintendent for the professional growth of the teachers. Teachers shall cooperate with the principal in ascertaining the cause of nonattendance of pupils that he may report all violators of the compulsory attendance law to the attendance officer in accordance with rules promulgated by the State Board of Education.

Principals, teachers, substitute teachers, voluntary teachers, teachers' aids and assistants and student teachers in the public schools of this State may use reasonable force in the exercise of lawful authority to restrain or correct pupils and maintain order. No county or city board of education or district committee shall promulgate or continue in effect a rule, regulation or bylaw which prohibits the use of such force as is specified in this section.

It is true that a three-judge court is not required when a constitutional attack upon a state statute is insubstantial. Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933) ; *see* Gonzalez v. Automatic Employees Credit Union, 419 U.S. 90, 95 S.Ct. 289, 42 L.Ed.2d 249 (1974). Goosby v. Osser, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973), states the insubstantiality standard:

> "Constitutional insubstantiality" for this purpose has been equated with such concepts as "essentially fictitious," . . . "wholly insubstantial," . . . "obviously frivolous," . . and "obviously without merit," . .. The limiting words "wholly" and "obviously" have cogent legal significance. . . . A claim is insubstantial only if " 'its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.' "

409 U.S. at 518, 93 S.Ct. at 858 (citations omitted). Plaintiffs' claims in this suit are certainly not "wholly insubstantial" or "obviously frivolous." No Supreme Court decision forecloses them—quite the contrary, it is upon several such decisions that plaintiffs base their attack against the North Carolina practice. Moreover, lower federal courts that have considered claims similar to plaintiffs' have not found their disposition self-evident, *see, e. g.,* Glaser v. Marietta, 351 F.Supp. 555 (W.D.Pa.1972), nor do we. We therefore reject defendants' first argument.

Defendants' second argument is elusive. They would have us see the questioned statute as infinitely malleable, its phrases "reasonable force" and "lawful authority" capable of connoting whatever constitutional restrictions a court might impose on the infliction of corporal punishment. Viewed this way the statute appears beyond constitutional reproach: a decision that parental consent or certain procedures are prerequisites to corporal punishment would simply pour new meaning into the statutory adjectives "reasonable" and "lawful." Thus, they argue, plaintiffs' real contention is that the defendant school officials have used *un*reasonable force and exercised *un*lawful authority in inflicting physical punishment over parental consent and without adequate procedural safeguards.

In their statutory context, however, the words "reasonable" and "lawful" do not seem intended to perform the function assigned them by defendants. Defendants would liken them to the Due Process and Equal Protection Clauses of the Constitution, whose words embody an ever greater number of concepts as courts constantly revise their ideas of what process is "due" and what application of the laws "equal." But the statute's words are, of course, not in a constitution. Instead, they seem to us to embody no more than the traditional tort concepts that a person privileged to use force can use only the force necessary under the circumstances, *i. e.,* reasonable force, and that he can use force only for the purpose for which he is granted the privilege, *i. e.,* pursuant to his lawful authority. Viewed this way, the statute can be paraphrased to say that school officials in North Carolina are empowered by the legislature to use whatever force necessary under the circumstances for the limited purposes of correcting their pupils and maintaining order.

With the statute so construed, it is clearly subject to the attack made by plaintiffs. Indeed, defendants argue in their briefs and oral argument that school officials can corporally punish pupils over parental objections and without antecedent procedural safeguards. They have alluded to the statute as authority for their position, and have cited us to state court cases and an eminent North Carolina treatise as evidence that state policy under this statute has long given school officials such power. Thus there is no disputing that the statute allows the practices that plaintiffs chal-

lenge, or that school officials acting pursuant to their authority under the statute engage in those practices.

Thus this case differs from Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941), relied upon by defendants. There the United States had sought an injunction from a single district judge against a state governor who had declared martial law in an effort to block construction of a federal project. The governor claimed that only a three-judge court could hear the suit for injunction, because he claimed justification for his actions in state constitutional provisions making him Commander-in-Chief of the militia and statutes granting him broad police powers. Noting that "[i]n its complaint the United States did not impugn the validity of these [state] provisions," the Supreme Court held a three-judge court unnecessary because "an attack on lawless exercise of authority in a particular case is not an attack upon the constitutionality of a statute conferring the authority even though a misreading of the statute is invoked as justification." 312 U.S. at 252, 61 S.Ct. at 484.

In this case, unlike *Phillips*, plaintiffs directly attack the constitutionality of a state statute, and the statute, again unlike *Phillips*, has always been read to authorize the conduct of which they complain. *Cf.* Query v. United States, 316 U.S. 486, 62 S.Ct. 1122, 86 L.Ed. 1616 (1942). Plaintiffs seek "to interpose the Constitution against enforcement of a state policy," which is precisely the situation that the Court in *Phillips* said requires a three-judge court. 312 U.S. at 251, 61 S.Ct. at 483. In this respect this case is like the recent Supreme Court case of Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). In *Goss* a three-judge court was required to hear a challenge to a state statute that gave school authorities the power to suspend pupils. The basis of the challenge was that the statute allowed suspensions without procedural safeguards, and that the policy of officials acting under the statute was to suspend without such safe-

guards. *See* 419 U.S. at 567, 584, 95 S.Ct. 729, 42 L.Ed.2d 725. Here the assertion is that the North Carolina statute allows corporal punishment without parental consent and adequate procedures, and that officials acting pursuant to the statute regularly punish corporally without such consent or procedures. We see no difference between this case and *Goss*, and therefore reject defendants' second argument against jurisdiction.

## II.

The Supreme Court first acknowledged the constitutional stature of parental rights over half a century ago in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). There the Court, speaking of the right "to marry, establish a home and bring up children" as components of the liberty protected by the fourteenth amendment, 262 U.S. at 399, 43 S.Ct. at 626, struck down a state law forbidding certain foreign language instruction in part because it arbitrarily interfered with "the right of parents" to procure such instruction for their children, *id.* at 400, 43 S.Ct. 625, 67 L.Ed. 1042. Two years later the Court in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), struck down another state statute requiring public school attendance because it "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control," *id.* at 534–35, 45 S.Ct. at 573.

The *Meyer* and *Pierce* decisions have since been interpreted by the Court as recognizing that, under our constitutional scheme, "the custody, care and nurture of the child reside first in the parents." Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *see* Wisconsin v. Yoder, 406 U.S. 205, 232–33, 92 S.Ct. 1526, 32 L.Ed. 2d 15 (1972). Mrs. Baker urges that the right to determine disciplinary methods for Russell Carl is part of her primary right to and responsibility for his "custody, care and nurture"; that as

such it is a fundamental right; and that the state therefore must show a compelling interest in order to punish Russell Carl corporally against her wishes.

■ ▇ We agree with Mrs. Baker that the fourteenth amendment concept of liberty embraces the right of a parent to determine and choose between means of discipline of children, but few constitutional rights are absolute. Our inquiry does not end with the conclusion that Mrs. Baker has such a right but we must go on to consider the nature and extent of the state's interest in school discipline. Sometimes the rights of citizens that find protection within the Constitution are overborne by a countervailing and greater state interest. We think that is the situation here—whether the test to be applied is that of a compelling state interest or simply of a rational and legitimate interest in maintaining order and discipline in the public schools. We embark upon the traditional analysis, aware that to apply the compelling interest test merely encapsulates the result and that "no state law has ever satisfied this seemingly insurmountable standard." Dunn v. Blumstein, 405 U.S. 330, 363–64, 92 S.Ct. 995, 1013, 31 L.Ed. 2d 274 (Burger, C. J., dissenting).

We reject Mrs. Baker's suggestion that this right is fundamental, and that the state can punish her child corporally only if it shows a compelling interest that outweighs her parental right. We do not read *Meyer* and *Pierce* to enshrine parental rights so high in the hierarchy of constitutional values. In each case the parental right prevailed not because the Court termed it fundamental and the state's interest uncompelling, but because the Court considered the state's action to be arbitrary, without reasonable relation to an end legitimately within its power. *See* 268 U.S. at 535–36, 45 S.Ct. 571, 69 L.Ed. 1070, 262 U.S. at 400, 403, 43 S.Ct. 625, 67 L.Ed. 1042. Nor has the Court subsequently spoken of parental rights as fundamental; on the contrary, its references to them lend support to the view that they are not. *See Yoder, supra,* 406 U.S. at 233, 92 S.Ct. 1526; *Prince, supra,* 321 U.S. at 166–67, 64 S.Ct. 438. Nor, contrary to Mrs. Baker's contention, do emanations from such cases as Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), or Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), combine with the Court's direct discussions of parental control over child-rearing to raise the parental right to a status as fundamental. *But see Glaser, supra,* at 559–60 (1972).

Of course, the Court's failure, to date, to refer to parental rights as fundamental does not preclude our recognizing them as such. The Court's statement in San Antonio School Dist. v. Rodriguez, 411 U.S. 1, 33–34, 93 S.Ct. 1278, 1297, 36 L. Ed.2d 16 (1973), that the status of a particular right as fundamental depends upon whether it is "explicitly or implicitly guaranteed by the Constitution," coupled with the Court's finding in *Meyer* and *Pierce* that parental rights are "implicit" in the concept of liberty in the fourteenth amendment, would provide a reasoned basis for determining that parental rights are today to be deemed fundamental. *Cf.* Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). Mrs. Baker's power to decide whether corporal punishment is to be used with Russell Carl, as one of her parental rights, could then in perfect syllogistic logic be accorded the highest degree of constitutional protection.

We refuse to travel this path, for although perfectly marked out by logic it seems to us insufficiently directed by reason and common sense. A finding that Mrs. Baker's power of decision regarding corporal punishment is fundamental would require the state to show both a compelling interest and the unavailability of alternative means of fulfilling that interest before it could contravene her decision. *See, e. g.,* Police Dept. of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). A sensitive consideration of the nature of

Mrs. Baker's right to preclude corporal punishment, and the context in which she seeks to assert it, simply forecloses the imposition of such a burden upon the state.

Insight into the nature of Mrs. Baker's right, for the purpose of deciding whether it should receive ultimate protection, can best be gained by comparing it to the parental rights at stake in *Meyer, Pierce,* and *Prince*. The Court in *Meyer* spoke of "the natural duty of the parent to give his children education," and the "supreme importance" which Americans had always attached to the acquisition of knowledge, 262 U.S. at 400, 43 S. Ct. 625, 67 L.Ed. 1042; it was this natural duty and this traditionally vital concern that the parents there were interested in furthering. In *Pierce* the Court was faced with a claim invoking "the right of parents to choose schools where their children will receive appropriate mental and religious training," 268 U.S. at 532, 45 S.Ct. at 572, and it remarked how the availability of schools meeting such a need had "long [been] regarded as useful and meritorious," *id.* at 534, 45 S.Ct. at 573. And in *Prince* the parental right was the inculcation of one's religious beliefs in one's children, which unquestionably partakes of the "preferred position in our basic scheme" that is accorded the exercise of one's religion. *See* 321 U.S. at 164, 64 S.Ct. at 441.

The common characteristic of the parental interests in all three cases is their venerability. In each instance the Court started with a premise that could provoke no quarrel—that the specific parental concern implicated was worthy of great deference due to its unquestioned acceptance throughout our history. Mrs. Baker's opposition to corporal punishment, on the other hand, enjoys no such universal approbation in our society even today, and certainly not historically. Quite the contrary, it bucks a settled tradition of countenancing such punishment when reasonable. *See generally* F. Harper & F. James, The Law of Torts § 3.20

(1956); 68 Am.Jur.2d, Schools § 258 (1973). And though we accept Mrs. Baker's assertion that corporal punishment of children is today discouraged by the weight of professional opinion, we are also cognizant that the issue is unsettled and probably incapable of categorical resolution. *See Glaser, supra,* at 557; Sims v. Board of Educ., 329 F. Supp. 678, 685 (D.N.Mex.1971); Ware v. Estes, 328 F.Supp. 657, 659 (N.D. Tex.1971). We simply cannot foresee a parent's absolute disapproval of reasonable corporal punishment soon achieving the kind of societal respect that is clearly accorded the desire to expose one's child to certain fields of knowledge, to send him to a private or parochial school, or to pass on one's religious heritage to him. Thus, regardless whether the specific parental interests involved in *Meyer, Pierce,* and *Prince* should be considered fundamental, and without disparaging one whit Mrs. Baker's right to decide the methods of punishment to be employed with Russell Carl by herself or other private parties, we cannot say that her right of total opposition to his corporal punishment is fundamental in a constitutional sense.

■ We believe, therefore, that defendants can justify their corporal punishment of Russell Carl by showing that it furthered a legitimate state end. *Accord,* Gonyaw v. Gray, 361 F.Supp. 366, 369 (D.Ver.1973). The statute under challenge authorizes such punishment only "to restrain or correct pupils and maintain order." Since Mrs. Baker has not charged, and we find no evidence to suggest, that Russell Carl's punishment was for any other purpose, we must decide whether the statutory purposes are legitimate and sufficient to overcome Mrs. Baker's desires.

■ There can be no doubt about the state's legitimate and substantial interest in maintaining order and discipline in the public schools. Education may not be a fundamental interest, *see Rodriguez, supra,* 411 U.S. at 29–40, 93 S.Ct. 1278, 36 L.Ed.2d 16, but the people of

our states have long recognized its vital importance and provided it to their young people at public expense. *See, e. g., Yoder, supra,* 406 U.S. at 205, 92 S.Ct. 1526, 32 L.Ed.2d 15. It should be clear beyond peradventure, indeed self-evident, that to fulfill its assumed duty of providing an education to all who want it a state must maintain order within its schools, as the Supreme Court has recognized on several occasions. *See, e. g.,* Goss v. Lopez, *supra,* 419 U.S. at 577, 95 S.Ct. 729; Tinker v. Des Moines School Dist., 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

■ There are many, of course, including Mrs. Baker and the experts upon whose testimony and writings she relies, who believe that school officials can and and should maintain without using corporal punishment. We are aware that their view is shared by many professional educators, parents and others. But as we noted above, opinion on the merits of the rod is far from unanimous. On such a controversial issue, where we would be acting more from personal preference than from constitutional command, we cannot allow the wishes of a parent to restrict school officials' discretion in deciding the methods to be used in accomplishing the not just legitimate, but essential purpose of maintaining discipline. *Cf.* Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). So long as the force used is reasonable—and that is all that the statute here allows—school officials are free to employ corporal punishment for disciplinary purposes until in the exercise of their own professional judgment, or in response to concerted pressure from opposing parents, they decide that its harm outweighs its utility.

### III.

■ Entirely different considerations come into play with Russell Carl's claim that the statute allows corporal punishment without due process. The initial inquiry must be whether Russell Carl has a liberty or property interest, greater than de minimis, in freedom from corporal punishment such that the fourteenth amendment requires some procedural safeguards against its arbitrary imposition. Only if such an interest is found must we proceed to an inquiry as to the type of procedure to be employed. *See generally* Goss v. Lopez, *supra,* 419 U.S. at 574, 92 S.Ct. 729; Board of Regents v. Roth, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Sniadach v. Family Finance Corp., 395 U.S. 337, 342, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (Harlan, J., concurring).

We believe that Russell Carl does have an interest, protected by the concept of liberty in the fourteenth amendment, in avoiding corporal punishment. This conclusion is compelled by a conflux of many premises and postulates. Premier among them is the expansive nature of fourteenth amendment liberty, which the Supreme Court has often emphasized. *See, e. g., Roth, supra,* 408 U.S. at 572, 92 S.Ct. 2701. We believe that the concept must include, in appropriate instances, personal security in the seemingly small things of life as well as in the obviously momentous. *Cf.* Richards v. Thurston, 424 F.2d 1281, 1284–85 (1st Cir. 1970). Secondly, the legal system, once quite tolerant of physical punishment in many contexts, has become less so. *See generally* Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968) (prohibiting use of the strap on prisoners); 18 U.S.C. § 2191 (1970) (outlawing flogging of sailors on United States ships); 1 F. Harper & F. James, The Law of Torts § 3.20, at 289 (1956) (discussing husband's loss of the privilege of corporally disciplining his wife, and employer's similar loss of privilege as to domestic employees). Indeed, it is questionable at best whether the law would now privilege any degree of corporal punishment of an adult. While the state historically has been granted broader powers over children than over adults, *see, e. g., Prince, supra,* 321 U.S. at 167–70, 64 S.Ct. 438, the Supreme Court

**302**

has explicitly recognized that children have rights, too. Goss v. Lopez, *supra*, 419 U.S. at 570–576, 95 S.Ct. 729; *Tinker, supra*, 393 U.S. at 506, 511, 89 S.Ct. 733. Thus, although the weight of legal authority still permits corporal punishment of public school children, *see* Restatement (Second) of Torts § 153(2) (1965), it seems uncontrovertible that the child has a legitimate interest in avoiding unnecessary or arbitrary infliction of a punishment that probably would be completely disallowed as to an adult. Moreover, North Carolina has itself given school children reasonable expectation of freedom from excessive or pointless corporal punishment by writing into section 115–146 the requirements that such punishment be reasonable and used for specific purposes only. *Cf.* Goss v. Lopez, *supra*, 419 U.S. 565, 95 S.Ct. 729; *Roth, supra*, 408 U.S. at 577–78, 92 S.Ct. 2701. Yet it has failed to provide any procedural protection to insure that those acting under the statutory authority will adhere to its dictates and neither punish arbitrarily nor use unreasonable force.

Having concluded, upon due consideration of all the above factors, that North Carolina school children have a liberty interest, we must decide what procedural safeguards should protect it. We are guided here by the principle, recently reaffirmed by the Supreme Court in a similar context, "that the interpretation and application of the Due Process Clause are intensely practical matters and that 'the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" Goss v. Lopez, *supra*, 419 U.S. at 577, 95 S.Ct. at 738, *quoting* Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed. 2d 1230 (1961).

Our task is to fashion procedures that accommodate as best as possible the child's interest with the state's unquestioned interest in effective discipline. There is no dispute about the state's assertion that elaborate, time-consuming procedures antecedent to infliction of corporal punishment would destroy its value, as the essence of corporal punishment is swift and tangible wages for one's transgression. *Glaser, supra*, at 558–59; *Sims, supra*, at 683. Plaintiffs concede, as we believe they must, that this basic consideration precludes our requiring the full panoply of procedural due process rights, *i. e.*, such things as formal notice, right to counsel, right of confrontation and cross-examination.

Instead, plaintiffs request only those minimal procedures necessary to protect the student's interest without undercutting the disciplinary value of the punishment. We believe such procedures are few in number, but that is not to downplay their importance. First, except for those acts of misconduct which are so anti-social or disruptive in nature as to shock the conscience, corporal punishment may never be used unless the student was informed beforehand that specific misbehavior could occasion its use, and, subject to this exception, it should never be employed as a first line of punishment for misbehavior. The requirements of an announced possibility of corporal punishment and an attempt to modify behavior by some other means—keeping after school, assigning extra work, or some other punishment—will insure that the child has clear notice that certain behavior subjects him to physical punishment. Second, a teacher or principal must punish corporally in the presence of a second school official (teacher or principal), who must be informed beforehand and in the student's presence of the reason for the punishment. The student need not be afforded a formal opportunity to present his side to the second official; the requirement is intended only to allow a student to protest, spontaneously, an egregiously arbitrary or contrived application of punishment. And finally, an official who has administered such punishment must provide the child's parent, upon request, a written explanation of his reasons

and the name of the second official who was present.

## IV.

Plaintiffs do not assert that corporal punishment *per se* violates the eighth amendment prohibition of cruel and unusual punishment. *See* Ingraham v. Wright, 498 F.2d 248, 259–60 (5th Cir. 1974), and cases cited. Their claim instead is that the paddling administered to Russell Carl on December 6, 1973, was so harsh and excessive, considering the circumstances, as to amount to cruel and unusual punishment.[2]

It is an unsettled issue whether the eighth amendment prohibition applies at all to the corporal punishment of school children. *Compare, e. g., Gonyaw, supra,* at 368 (stating that it does not), *with Ingraham, supra,* at 259 n. 20 (stating that it does). Even if we assume, without full consideration of the question, that it does apply, we find as a fact that the punishment received by Russell Carl did not approach the level of cruel and unusual.

His teacher, a female, administered two licks to his buttocks with a wooden drawer divider a little longer and thicker than a foot-ruler. Russell Carl himself testified that he felt only a stinging sensation, and claimed no lasting discomfort or disability from the paddling. Nor does it appear that he had to leave school early because of it. Doctors did testify that Russell Carl is an abnormally frail and sensitive child to whom such a paddling could be more emotionally or psychologically damaging than to the normal child, but we find that

the teacher who administered the paddling and other school officials were unaware of his condition. Mrs. Baker testified that she found two bruise marks which remained for several days, but she did not characterize them as severe and there was no evidence of hematoma. In short, this record does not begin to present a picture of punishment comparable to that in *Ingraham, supra,* at 255–59, or in Nelson v. Heyne, 491 F.2d 352 (7th Cir. 1974), which we believe indicate the kinds of beatings that could constitute cruel and unusual punishment if the eighth amendment is indeed applicable.

## V.

By way of summary, we hold that North Carolina General Statutes § 115–146 is constitutional on its face. But we also hold that to implement the statute without according to students procedural due process would be a violation of the fourteenth amendment. We have suggested minimal procedures that would satisfy the fourteenth amendment. Nothing contained herein, however, is intended to prevent or dissuade the state from further elaboration upon necessary requirements in order to accomplish fairness in administration.

We hold on the facts of the case that the punishment of Russell Carl Baker was not cruel and unusual within the meaning of the eighth amendment.

We request that counsel for plaintiffs prepare and submit to counsel for defendants an appropriate judgment to be submitted thereafter to the court.

2. The claim that Russell Carl's punishment was so excessive as to violate the eighth amendment does not implicate N.C.G.S. § 115–146, but instead challenges only a particular instance of punishment. This claim is appropriate for a single judge. Nevertheless we decide it rather than referring it to a single judge because we necessarily became familiar with the contentions and the evidence while considering the challenges to the statute. To send it to a single judge would therefore waste rather than conserve judicial resources. *See* Allee v. Medrano, 416 U.S. 802, 812 & n. 8, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974).